35 C.C.A.(Patents)

### Application of LINDENBLAD.
### Patent Appeal No. 5438.

Court of Customs and Patent Appeals.
May 4, 1948.

Harry Tunick and Charles H. Brown, both of New York City (Conder C. Henry, of Washington, D. C., of counsel), for appellant.

W. W. Cochran, of Washington, D. C. (H. S. Miller, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and HATFIELD, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

Appellant seeks review and reversal of the decision of the Board of Appeals of the United States Patent Office in so far as it affirmed the examiner's rejection of eleven of the claims in appellant's application for patent for alleged "Improvement in Radio Relaying System." Seven claims stand allowed. The appealed claims are numbered 1, 2, 3, 4, 8, 10, 13, 14, 15, 20 and 21.

Claims 10, 14 and 20 were submitted in the brief for appellant as representative claims, and we here reproduce them.

"10. A radio relaying station comprising a high lift-slow speed airplane for use at a distance of 35,000 feet and higher above the earth's surface, said station having mounted on said airplane a directive antenna for receiving signals and an omni-directional antenna for broadcasting said signals over a wide area."

"14. A radio relaying system comprising a transmitting station mounted on the earth's surface, and a pair of spaced aircraft repeater stations located above the earth's surface and located at different distances from said transmitting station, means at said transmitting station for radiating ultra short waves of the order of one meter and less, a directive antenna on that one aircraft repeater station which is located nearest said transmitting station for receiving said waves, an omnidirectional antenna on said last aircraft for radiating waves having the same modulations as the received waves, and means in said last aircraft for automatically transferring energy between said two antennas, said other aircraft also having a directive antenna for receiving the waves radiated by said first aircraft and an omnidirectional antenna for reradiating waves."

"20. A television radio relaying system comprising a transmitting station located substantially on the earth's surface for radiating ultra short waves, a relay station located at a relatively great distance above the earth's surface and suspended in the air, said relay station having an antenna for receiving television signals transmitted from the earth station, a radio receiver in said relay station coupled to said antenna, and transmitting apparatus also located on said relay station and coupled to the output of said receiver, and a multi-directional antenna located on said relay station for relying the television signals received by said relay station, said last antenna being so constructed and arranged as to service an extremely wide area many miles in diameter, below said suspended relay station, said relay station having automatic relaying apparatus."

Those quoted are the only claims discussed in the brief for appellant before us, and we are of opinion that if claim 10 should be held allowable it would logically follow that all the appealed claims should be allowed, and that unless claim 10 be found allowable no one of the other appealed claims should be allowed. Consequently there is no necessity for analyzing the claims other than those quoted.

It may be stated that claim 20, supra, is the only claim which specifically mentions television. The others, however, seemingly are broad enough to cover that art.

As is discernable from the quoted claims the application relates to a radio relaying system in which high lift-slow speed airplanes are employed in transmitting and relaying programs; "particularly," says the brief for appellant, "an aircraft mounted radio system which utilizes radio waves of such high frequencies that they are known as direct-line or line-of-sight radio waves."

The brief for appellant states in substance that he has conceived the idea of broadcasting from the stratosphere by means of a plane flying continuously in that part of the space above the earth and that the conception includes point-to-point relaying from plane to plane in the stratosphere. It is said that by going into the stratosphere an extremely high antenna location is provided which effectively increases the radiated power to such an extent that wide broadcast coverage is secured with radio transmitters of small rating. The general idea, as we understand it, is that by utilizing, as carriers of relay stations, planes flying through the stratosphere television and other programs may be transmitted over long distances, no objects such as high buildings, hills, mountains, etc., being in the paths of transmission.

One figure of the drawings discloses two airplanes represented as being about seven miles above the surface of the earth and from 400 to 600 miles apart. Paths of transmission from stations near the surface of the earth to the planes and from plane to plane and from plane to earth are indicated. The number of planes in the stratosphere, of course, may be determined as desired to cover a particular line. The specification suggests that the airplane relay station located in the stratosphere can "service an area of a diameter of about 500 miles."

It is taught that in operation short wave radio signals are transmitted from a transmitter located near the earth's surface to a relay station on a plane. From there they may be transmitted to a receiving station near the ground or to a relay station on another plane from which they may be transmitted to the earth or to another plane.

A second figure of the drawings shows a form of mechanism which can be employed on the airplanes for relaying the programs, and it is explained in the specification.

The system is described in the brief of the Solicitor for the Patent Office as follows (numerals identifying certain features being deleted as indicated by asterisks):

"A transmitter A located near the earth's surface transmits its short-wave radio signals, which are said in one claim, claim 20, to be 'television signals,' to a complete relay station B, which is mounted upon a high-lift, slow-speed airplane flying at an altitude of about seven miles. The airplane has a directional antenna * * * for receiving from the transmitter, and a nondirectional or omnidirectional antenna * * * for rebroadcasting the received signals to a receiver upon the ground. The airplane also has a second directive antenna * * * for retransmitting the received signals to a second relay station C similarly placed upon another airplane. * * *"

In rejecting the claims the Primary Examiner cited the following patents as references:

Blackmore, 806,052, November 28, 1905.

Morris, 1,624,966, April 19, 1927.

Goldsmith 2,155,821, April 25, 1939.

Luck, 2,252,083, August 12, 1941.

Those were also listed, and each was referred to, in the decision of the board, and in a second decision rendered in response to a request for reconsideration the board also cited a British patent No. 120,788, November 28, 1918, in support of the board's statement that "captive barrage balloons have been used [for radio transmitters] up

to 15,000 feet and higher above the earth with contemplated use as high as 30,000 feet * * * which is of the same order as that stressed by appellant * * *."

The British patent was not included in the record brought before us but the statement of the board as to what it shows, of course, is accepted as correct. In re Pirani and Nitschke, 75 F.2d 223, 22 C.C.P.A. (Patents) 1002.

The patent to Blackmore is for a high-frequency receiver designed for use in wireless telegraphy. The specification states that it "may be suspended at high altitudes by means of balloons or other devices." It is taught that the high frequency currents actuate apparatus which will operate a second transmitter of electrical waves and that this overcomes or obviates the difficulty in transmitting waves or rays over long distances occasioned by the curvature of the earth. The patent mentions "high altitudes" but gives no specific altitude in terms of measurement such as feet or miles.

The Morris patent shows a system wherein ships traveling across an ocean over which it is desired to transmit a message are supplied with radio equipment employed as repeating or relaying stations. It teaches the communication of one "land" station with another "land" station by passing the message through intervening ships having radio repeating apparatus of the proper type.

The features of the Goldsmith patent regarded as pertinent are recited in the brief of the Solicitor for the Patent Office as follows (page references omitted):

" * * * It discloses in Fig. 13 * * * a relay station which may be used in a system useful with short wave and ultrashort wave channels where intermediate relay stations are employed * * *. The relay includes a directional receiving antenna for receiving from the initial transmitter with appropriate apparatus for rebroadcasting from a nondirectional antenna. There is also a second directional transmitting antenna. The relay station includes suitable demodulating apparatus, as well as power amplifiers. Switching apparatus is also provided * * *. Fig. 9 * * *

is said * * * to show 'a typical concatenation of relay stations A, B, C, D, E, and F which are so associated that communications may be established between any two of such stations.' As practical applications of the system are mentioned communication 'to or from the aircraft * * * with automotive police vehicle' * * *, 'with railroad trains' * * *, and 'with river and harbor craft' * * *."

The Luck patent recites that it relates to a radio system designed especially for controlling the traffic of aircraft in the vicinity of an air port. It appears to have been cited for its disclosure of a system embracing a beacon transmitter located on the ground which transmits signals to a receiver on an aircraft which receiver controls, through mechanism, a transmitter on the aircraft that sends signals to a receiver at the air port.

The Primary Examiner rejected all of the appealed claims, (1) "as not patentably distinguishing over the disclosure of the patent to Morris in view of a specific relay shown in Goldsmith and the relay shown in Luck or Blackmore on a specific form of dirigible craft" and (2) "as met in the relay system shown in Luck or Blackmore in view of the relay system shown in Goldsmith." The board expressly affirmed both grounds of rejection.

The brief for appellant discusses each of the cited patents except the British patent no copy of which was included in the record. To that the brief makes no reference. As has been stated the board's statement of what that patent shows is accepted as correct, and that seems to cover the feature of height from the earth's surface, assuming without holding that altitude may have some bearing upon the issue.

Of the Blackmore patent the brief says, in substance, that the signals which are received by the receiver are reproduced at points near the earth's surface; that it can only serve a small and limited area; and that the great weight of the cable of the captive balloon precludes attainment of the high altitudes contemplated by appellant "and set forth in the claims."

We observe that appealed claim 10, supra, is the only claim of the application before

us which definitely specifies height from the earth's surface—35,000 feet. Claim 14, supra, specifies "above the earth's surface" and claim 20, the only claim specific to television recites "a relatively great distance above the earth's surface."

It is asserted in the brief that the Goldsmith patent is a *ground* type of relay station, emphasis being placed upon the word "ground"; that it makes no suggestion of how to overcome the "insurmountable difficulties" involved in attempting its use for nation wide or wide area television "broadcasting on ultra short radio waves," and that there is no suggestion in it that the features disclosed by Goldsmith may be included in a television system. Indeed the brief says:

"* * * As a matter of fact, the very contrary is true. On page 6 of the Goldsmith patent, column 1, the patentee enumerates the applications of his concept. Of the five items enumerated, not one even remotely hints at television as a possible application."

Considering appellant's claims without reference to his specification, no one of them except claim No. 20, seems to us to remotely hint at television as a possible application of appellant's concept, but they were not rejected on that ground, nor do we think that the Goldsmith patent should be cast aside as a reference for that reason. We note that the brief for appellant concedes that "Certain aspects of Goldsmith's system may serve a useful function in a television system such as was conceived by appellant." Goldsmith's application is not limited to a ground system, although it does not specify an aerial system.

With respect to the Luck patent it is insisted that it does not involve relaying; that it does not involve the transmission of information received from another station, and that it merely furnishes information as to its identity, bearing and altitude with respect to an air port. It is said (identifying numerals being omitted):

"* * * The signal from the rotating beacon at the airport is utilized to start a pulse generator * * * on the aircraft, and the output of this pulse generator * * * is keyed by the altitude and identifying signals from the aircraft keyer * * * to thereby actuate the transmitter * * * to send out a pulse having a certain phase relation relative to the airport beacon signal. * * *"

One definition of "relay" given in Webster's New International Dictionary is:

"3. Elec. An electromagnetic device by which the opening or closing of one circuit produces a corresponding opening or closing of another, more powerful one. * * *"

As we understand the Luck device it has a relay feature, as was specifically held by the Primary Examiner, who said, "Luck and Blackmore each disclose a radio relay station mounted on an aircraft." The applicability of the Luck patent as a reference here may be conceded to be limited but it is, we think, a proper reference for the purpose for which it was cited.

It is contended that the Morris patent employs ships instead of aircraft as carriers of the relay mechanisms; that the problem of covering the ocean with broadcast information "does not arise" (meaning, we suppose, in the Morris operation), and that because the Morris stations are ambulatory, the received and transmitted signals may fade in and out and reproduction be anything but satisfactory.

It is not supposed that appellant's airplanes will stand still in the stratosphere. The specification in fact depicts them as being in movement—"flying above the weather." Therefore they must be ambulatory.

Appellant's brief discusses two other patents which seem to have been cited during the prosecution of the application but subsequently withdrawn or abandoned as references. They require no notice by us.

The brief for appellant quotes and very briefly discusses a paragraph hereinafter quoted from the final decision of the Primary Examiner, and this is, in fact, the only ground of rejection which is specifically discussed by appellant.

It is pointed out in the brief of the Solicitor for the Patent Office that the ground so quoted and discussed "is not exactly either one of the two grounds specified by the examiner * * * in his

*statement,* both of which were specifically affirmed by the Board of Appeals" (Italics supplied), and it is suggested that technically the case is left in a situation "where appellant has argued neither of the two outstanding grounds of rejection." It is further suggested that failure to argue even one ground of rejection "would seem to leave the case in the same situation as if no reason of appeal had been presented as to that ground," and that this Court "apparently could not reverse the decision of the Board of Appeals" without reversing its own holdings "in numerous similar cases," citing In re Boyce, 144 F.2d 896, 32 C.C.P. A. (Patents) 718.

The brief of the Solicitor for the Patent Office, however, concedes that the ground of rejection quoted by appellant from the Primary Examiner's final decision is "somewhat like" the first ground of rejection recited in the statement following the appeal to the board, the chief difference being that the Blackmore patent was included in the first ground of the statement but not in the quotation from the final decision.

We observe that the statement following the appeal to the board was not signed by the same individual who signed the final decision, and we note also that a third individual signed what evidently is a reply to a brief submitted before the board by appellant. So, first and last, at least three primary examiners appear to have considered the case.

The paragraph from the final decision, rendered December 12, 1944, quoted in the brief of appellant before us reads:

"Claims 1, 2, 3, 4, 6, 8, 10, 11, 13, 14, 15, 20 and 21 are rejected as not patentably distinguishing over the combination shown in Morris of a relay station on a dirigible craft in view of specific relay shown in Goldsmith and the relay shown in Luck on a specific form of dirigible craft. * * *"

The ground of rejection recited in the Primary Examiner's statement following the appeal to the board dated July 6, 1945, reads:

"Claims 1, 2, 3, 4, 8, 10, 13, 14, 15, 20 and 21 are finally rejected as not patentably distinguishing over the disclosure of the patent to Morris in view of a specific relay shown in Goldsmith and the relay shown in Luck or Blackmore on a specific form of dirigible craft."

Obviously the only difference between the two holdings is that the Primary Examiner who prepared the statement added to the first ground of rejection the Blackmore patent which the Primary Examiner who rendered the decision from which the appeal to the board was taken had cited in his second ground of rejection.

This court is loath to dispose of cases on technicalities and will not do so when the pleadings are such as to enable us properly to consider the merits. We think appellant's reasons of appeal are sufficient to bring the merits before us here, and that appellant's brief, although meagre, is sufficient to justify consideration of at least the first ground of rejection.

Further we think sufficient has been said to indicate clearly our belief that the first ground of rejection was properly applied. As we view the case, we would be of opinion, were the matter before us in that form, that the claims should be rejected on the ground stated in the final decision of the examiner without reference to the Blackmore patent.

Taking claim 10 which we have hereinbefore discussed as being representative, it seems obvious to us that the Goldsmith patent discloses everything covered by that claim except that it does not show the relay mechanism mounted on an airplane. The relay station of Luck is mounted on an airplane. So far as operation is concerned, we find nothing of record to indicate that a system which will work at the earth's surface will not also work when elevated above that surface. It is a fair assumption of course that modifications would be required to meet the conditions resulting from the type of carrier used in conveying the relay station and it is quite possible that the allowed claims in this case cover modifications essential when an airplane is used as a carrier. We do not, however, attempt to construe the allowed claims because they are of no interest here.

116

In appellant's brief there are a number of questions which the brief states neither the Primary Examiner nor the board answered. We do not find where they were requested to answer such questions, nor do we hold that it would have been incumbent upon them to answer had the request been made.

The patent to Morris is not included as one of the references in the second ground of rejection. It is questionable whether the discussion in appellant's brief is sufficiently definite to justify consideration of that ground—certainly nothing is presented which would justify its reversal.

The decision of the Board of Appeals is affirmed.

Affirmed.

By reason of illness, O'CONNELL, Associate Judge, was not present at the argument of this case and did not participate in the decision.